Filed 9/15/14  Indio Police Command Unit Assn. v. City of Indio CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| INDIO POLICE COMMAND UNIT ASSOCIATION et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF INDIO et al., <br><br> Defendants and Appellants. | G050051 <br><br> (Super. Ct. No. INC1203493) <br><br> O P I N I O N |

Appeal from a judgment and postjudgment order of the Superior Court of Riverside County, Randall Donald White, Judge.  Affirmed and remanded with directions.

Jones & Mayer, Paul R. Coble and Jamaar M. Boyd-Weatherby for Defendants and Appellants.

Law Offices of Stephen J. Horvath, Stephen J. Horvath and Marc J. Berger for Plaintiffs and Respondents.

The City of Indio (the City) and its chief of police appeal from a judgment granting a permanent injunction in favor of the Indio Police Command Unit Association (the PCU), and two of its police officer members, prohibiting the City from implementing a planned reorganization of the City's Police Department's (the Department's) command staff until it demonstrated full compliance with the "meet and confer in good faith" requirements of the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500.5 et seq.).[1] They also appeal from the postjudgment order granting the PCU its attorney fees under Code of Civil Procedure section 1021.5. The appellants contend the injunction was improper because the City sufficiently complied with its meet and confer obligations, and the trial court abused its discretion by awarding the PCU attorney fees. We reject their contentions, affirm the judgment and postjudgment order, and remand with directions.

FACTS & PROCEDURE

*The PCU*

The PCU is the employee organization that represents the Department's sworn command staff in the positions of sergeant, lieutenant, and captain, and it is the only organization with the right to meet and confer on behalf of those command staff officers. In 2008, the PCU had 19 members, but by 2012, due to attrition and hiring freezes, its membership was down to 14. Police Lieutenant Johnny Romero (Lt. Romero) was the PCU's elected president; Police Sergeant Christopher Hamilton (Sgt. Hamilton) was the PCU's elected vice-president; and Police Lieutenant Phillip Han (Lt. Han), was the PCU's elected secretary/treasurer.

The PCU negotiated a Comprehensive Memorandum of Understanding with the City on behalf of its members in effect from July 1, 2009, to June 30, 2012 (the MOU) governing wages, hours, and other terms and conditions of employment. Relevant here, paragraph 7.2 of the MOU provides that although the City has the right to

_____

[1] All further statutory references are to the Government Code, unless otherwise indicated.

2

institute layoffs, "Prior to instituting any layoffs, the City agrees to meet with the PCU to discuss alternatives."

In June 2011, during the City's fiscal crisis, the PCU and the City agreed to a "Side Letter" providing for furloughs and reduction in other benefits. The Side Letter provided the MOU would be extended through June 30, 2013, and all recruitments for new or vacant positions would be subject to city council approval.

*Planned Reorganization*

In January 2012, Richard P. Twiss (Chief Twiss) was hired as police chief. On March 13, 2012, Chief Twiss wrote to the PCU's legal counsel, Wendell Phillips, informing the PCU he intended to implement a "strategic reorganization" of the Department's command structure that would eliminate the captain and the four lieutenant positions. The reorganization would create three new positions—two division commanders (sworn positions) and one administrative services manager (an unsworn position), to replace the Department's second tier and midlevel command management. Once implemented, there would be nine sergeant positions and five corporal positions. Chief Twiss advised Phillips he planned to discuss the reorganization with the involved employees and pursuant to the MOU was requesting to meet with Phillips to discuss the matter. The reorganization plan would become effective July 1, 2012.

Phillips replied via an e-mail on March 14, 2012, seeking further clarification and inquiring if the Department was attempting to engage in the meet and confer requirement of the MMBA. The Department's legal counsel responded on March 15, that *whether* a reorganization took place was not subject to collective bargaining under MMBA because reorganization of the Department's command structure was a management right. However, the City agreed the *impact* any such reorganization would have on employees was subject to collective bargaining, and the City and Chief Twiss intended to meet and confer with regard to those impacts. The Department's attorney stated Chief Twiss was still working on the proposed reorganization plan, and

3

after it was finished and approved by the city manager, the plan would be provided to the PCU and there would be a meet and confer opportunity.

On April 3, the City's human resources manager, advised Lt. Romero, as president of the PCU, in writing about the final details of the reorganization plan. The captain and lieutenant positions would be eliminated and replaced with two division commanders, who would be part of the executive management group, and one administrative manager, who would be part of the unrepresented group, and layoffs would be required. Under the MOU's seniority rules, the current captain could bump down to one of the new commander position (which was a lower classification than captain). However, because the commander position would be a higher classification than lieutenant, the current lieutenants would have to compete for the second commander position. A qualified lieutenant could bump down to the administrative manager position, or a qualified sergeant could make a lateral move to that new position. Under seniority rules three current lieutenants, including Lt. Romero, were eligible to bump down to sergeant positions. One current lieutenant, Lt. Han, had the least seniority in the entire command staff, and would be laid off (unless he was hired as the administrative manager). Three current sergeants, including Sgt. Hamilton, could bump down to corporal positions (in which case they would no longer be members of the PCU but would be represented by the separate police officer's association). On April 19, the City gave the affected employees written notification of the changes to their employment status.

*The Current Action; Motion for Injunction*

On May 18, 2012, the PCU and individuals Lts. Romero and Han, and Sgt. Hamilton (hereafter referred to collectively and in the singular as the PCU, unless the context indicates otherwise) filed the instant action, a petition for writ of mandate against the City and Chief Twiss (hereafter referred to collectively and in the singular as the City,

4

unless the context indicates otherwise).[2] Lt. Han was subsequently dismissed from the action. A preliminary injunction was granted. The PCU subsequently filed a motion for issuance of a peremptory writ of mandate and a permanent injunction enjoining the City from implementing the reorganization plan until it complied with the MMBA's good faith meet and confer requirements. The gist of its argument was the reorganization plan was not motivated by the City's dire financial straits but was largely concocted as a means to eviscerate the separate bargaining unit for supervisory command staff—all three elected officers of the PCU would be adversely affected and the total remaining command staff eligible for membership in the PCU would be reduced to nine. The PCU asserted the City failed to comply with its good faith meet and confer obligations.

The PCU's motion was supported by declarations and a "compendium of exhibits" including various documents described above, responses to interrogatories, and deposition transcripts.[3]

---

[2] The City has not included any of the pleadings in the record on appeal. Its notice designating the clerk's transcript designated a petition filed March 16, 2012, but needless to say the register of actions shows no such document filed on that date. The City has made no attempt to augment or otherwise correct the appellate record to include any of the pleadings. Based on the motion and the order granting the injunction, it is clear the PCU sought relief under Code of Civil Procedure sections 1085 (ordinary mandate) and 526 (injunctive relief).

[3] The City did not designate the PCU's compendium of exhibits as part of the record on appeal, and there was no notice filed pursuant to California Rules of Court, rule 8.124(a), designating any exhibits for transmittal. Apparently, the City believed it appropriate to invoke appellate review of the trial court's order without providing us with the evidence upon which it relied. It was a risky strategy in view of the well-established rule that "[i]t is the burden of appellant to provide an accurate record on appeal to demonstrate error. Failure to do so precludes an adequate review and results in affirmance of the [lower] court's determination." (*Estrada v. Ramirez* (1999) 71 Cal.App.4th 618, 620, fn. 1; *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 448 ["The absence of a record concerning what actually occurred [in the lower court] precludes a determination [of error]"].) However, the PCU compounded the problem in that it refers extensively to its exhibits in its respondent's brief, representing it was lodging the compendium of exhibits concurrently with its brief, but

In the PCU's responses to the City's interrogatories, it detailed strain between the PCU and certain city council members who the PCU had opposed in the 2010 election. Certain council members began publicly accusing the PCU of failing to negotiate in good faith on labor concessions, and then began expressing desires to reduce the Department's command staff positions. In September 2011, the City fired the police chief and appointed an interim chief and animosity between command staff and the interim chief increased. Chief Twiss's appointment was not supported by the PCU. At a planned labor concession meeting in early March 2012, the City's human resources manager told Lt. Romero (the PCU president), the City wanted to meet with the PCU immediately after that meeting about plans to reorganize the Department. He declined to meet until the PCU's legal counsel could be contacted. Chief Twiss's letter advising the PCU's legal counsel of the reorganization plan was sent March 13. After another labor concession meeting on March 27, with the city manager, finance manager, and human resources manager, the PCU leaders indicated the PCU was willing to make concessions but wanted to know what was going on with the reorganization plan. The city manager said they were completely different issues. At a meeting on April 3, the city manager told the PCU leadership the reorganization plan would take place no matter what and the PCU had no right to offer a "response" to the plan. "No alternatives to layoffs were discussed." At a meeting of all Department employees on April 17, Chief Twiss told employees the reorganization plan would save the City $524,000; four regular officers would be laid off, and the remaining commander position would be open

never did. We ordered the parties in possession of the trial exhibits and the Riverside County Superior Court to transmit all such exhibits to this court. We received no response from the City or the PCU, but Riverside County Superior Court has provided us with a supplemental clerk's transcript containing the PCU's compendium of exhibits filed in the trial court. Accordingly, we now have an adequate record to conduct our review. We caution counsel however they should take greater care when designating the appellate record rather than leaving it to the appellate court to track the record down.

to outside applicants (i.e., they would not simply allow an existing lieutenant to bump into that position) because Chief Twiss "want[ed] to get the best person for the job."

The PCU's interrogatory responses stated the reorganization would impact most PCU members through demotion or loss of seniority. For several months before the reorganization plan was announced, the PCU had been having concession talks with the City, but the reorganization plan was never mentioned. During that same time, the City was also having concession talks with the rank and file officer's bargaining unit, the Police Officer's Association (the POA), and during those talks the POA board was told if it agreed to concessions, "all of the cuts would come from the PCU." The PCU stated the reorganization would harm public safety because two sworn managers were not adequate for supervising the Department, remaining sergeants and corporals would have more supervisory duties and less time in the field, and there would be a loss of experienced supervision. In his separate interrogatory responses, Lt. Romero stated the reorganization plan would result in loss of five PCU members, including two of its elected officers, diminishing its power to effectively negotiate through numbers of members and membership dues revenues.

The PCU's motion was also supported by declarations from two retired PCU members. Richard Bitoni was police captain until he retired in September 2011, and had served as elected president of the PCU. Prior to his retirement there were never discussions about the command staff being "top-heavy" or needing to be reorganized. Lieutenants and sergeants were supervisors but also provided uniformed law enforcement services, backing up patrol officers and working off-duty at community events. The reorganization plan, which would reduce command staff from five sworn officers to two sworn officers and one unsworn supervisor would negatively impact the number of police officers on the streets, impacting public safety. In Bitoni's experience, it was preferable to have supervisory command staff in a separate bargaining unit from rank and file officers because of conflicts that would arise in disciplinary proceedings. The

7

proposed reorganization would result in only nine sergeants remaining eligible for membership in the PCU, which was too few members to maintain a viable employee association. The remaining sergeants would either have to merge into the rank and file officer's bargaining unit, or become unrepresented.

Richard Banasak was the police captain until he retired in June 2012. He declared there were no prior discussions with him concerning the proposed reorganization, and was told that because he was part of the PCU's bargaining group, he could not be part of management strategies.

In its opposition, the City asserted it had no duty to meet and confer regarding the proposed reorganization or layoffs, only about the effects of the reorganization and layoffs on the PCU's members. It asserted the meetings on March 27 and April 3 satisfied its meet and confer obligations and the PCU did not request any further discussions, but instead filed a grievance and then this action. The city manager and Chief Twiss provided declarations stating that at the April 3 meeting, the plan and its effects on members was fully explained to them. The City indicated to the PCU's legal counsel it "was open to further discussion," but the PCU never made any further requests to meet and confer.

*Ruling/Permanent Injunction*

On September 24, 2012, following a hearing on the PCU's motion, the trial court issued its minute order granting the motion. There was no statement of decision, but in its minute order, the court referred to the balancing test set forth in *Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651 (*Building Material*). The court found the City was required to meet and confer on a broad spectrum of issues, including those before the court, and there had been an insufficient effort on the City's part.

On October 11, 2012, the court issued its judgment granting a permanent injunction, enjoining the City from any of the following actions: recruiting applicants for

8

the commander position; changing the employment status of Lt. Romero or Sgt. Hamilton; implementing the reorganization plan; or laying off, terminating, or demoting any PCU member. The court ordered the injunction would remain in force through the term of the MOU, and could not be dissolved unless the City demonstrated it had fully complied with its meet and confer obligations under the MMBA.

*Attorney Fees Motion*

The PCU subsequently filed a motion for attorney fees under Code of Civil Procedure section 1021.5. The PCU's attorneys declared the retainer agreement with the PCU called for a discounted billing rate for the litigation of $175 per hour, and they had billed the PCU a total of 294 hours. But the attorneys declared their regular billing rates were between $250 and $350 per hour and based on those rates the total billings should have been $102,900. Based on a lodestar multiplier of 1.5, they requested total attorney fees of $160,650.

Lt. Romero and Sgt. Hamilton both provided declarations in support of the attorney fees motion. They declared the annual dues of a PCU member were $887.16. The PCU's treasury had been severely depleted by this litigation and the departure of several PCU members after the City announced the reorganization plan. They declared that under the reorganization plan they would be forced to demote (Lt. Romero to sergeant; Sgt. Hamilton to corporal), and would lose all seniority in those demoted positions. The sergeant position's salary range was about $1,300-$1,800 less per month than lieutenant; the corporal position was about $1,800 to $2,500 less per month than sergeant. Both declared that in their opinion the reorganization plan, which would deplete command staff of most of its sworn officers, would negatively impact the number of officers in the field.

The City opposed the attorney fees motion largely arguing the litigation had not enforced an important public right and was not an appropriate case for private attorney general attorney fees under Code of Civil Procedure section 1021.5. It also

9

argued the amount sought was excessive and the PCU was not entitled to a lodestar multiplier. The City did not submit any additional evidence in opposition to the motion.

Following oral argument, the court took the motion under submission. On November 20, 2012, it issued a minute order granting the motion. The minute order only stated, "[the PCU] is prevailing party for purposes of attorney fees. [Code of Civil Procedure section] 1021.5[;] *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382[,] 391 [(*Robinson*)]. No Lodestar enhancement inter alia. Attorney[] fees award at amount of actual expenditures." There is no other order in the record on appeal specifying a specific dollar amount of attorney fees awarded.

On December 10, 2012, the City filed its notice of appeal from the orders granting the permanent injunction and attorney fees.

*Postorder Events/Injunction Dissolved*

In March 2013, the City filed a motion to dissolve the permanent injunction that is the subject of this appeal. In its moving papers, the City explained that following issuance of the injunction it conducted seven meet and confer sessions with the PCU that resulted in an agreement on the structure and impact of the reorganization on the PCU. The City and the PCU agreed the position of captain could be eliminated from the PCU bargaining unit. The three commander positions would have the same pay grade as the current lieutenant pay grade, and could be filled by Lt. Romero and two other PCU lieutenants. They would not lose seniority. The commander positions would be classified as management (i.e., not part of the PCU bargaining unit). The agreement set forth other matters pertaining to the wages and working conditions of the commander position (exempt status, leave, and salary increases), and ended with "[t]he City and [the] PCU agree not to disparage one another as it pertains to the current reorganization of the . . . Department."

The PCU filed what it called "nominal opposition" stating it did not oppose dissolving the injunction but raised concerns about the impact on this appeal. On

10

April 12, 2013, the trial court granted the City's motion and ordered the injunction dissolved because the City had demonstrated full compliance with the injunction, the meet and confer requirements of the MMBA, and all applicable laws governing public employee labor relations.

DISCUSSION

*1. Mootness*

The PCU contends the City's appeal from the permanent injunction is moot because the permanent injunction has been dissolved. We disagree.

"It is well settled that an appellate court will decide only actual controversies and that a live appeal may be rendered moot by events occurring after the notice of appeal was filed. We will not render opinions on moot questions or abstract propositions, or declare principles of law which cannot affect the matter at issue on appeal. [Citation.] This rule has regularly been applied when injunctive relief is sought but, pending appeal, the act sought to be enjoined has been performed. [Citation.]" (*Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557.)

Although the City's full performance of the acts required by the permanent injunction seemingly renders the appeal from the injunction moot, we conclude the merits of the injunction must be addressed because "the propriety of the trial court's ruling on the merits of the action determines whether [plaintiff] was eligible for an award of attorney fees [under Code of Civil Procedure section 1021.5] as the successful party. [Citations.] Our review of the . . . relief provided in this case will have the practical effect of determining the propriety of the fee award, and therefore, the issues are not moot." (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 364-365; *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750-1751 [city's compliance with writ did not render appeal moot because award of attorney fees under Code Civ. Proc., § 1021.5 depended on propriety of ruling on merits]; see also *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 277-279 [appeal moot, but

11

merits addressed in connection with appeal from attorney fees order].)  Here, the trial court awarded the PCU its attorney fees under Code of Civil Procedure section 1021.5 because it was the prevailing party, and thus the issue of whether it properly prevailed is relevant to the attorney fees order and we will consider it.

*2. Substantial Evidence Supports the Judgment*

The City contends there is no evidence to support issuance of the injunction.  The City contends it was not required to meet and confer with the PCU regarding the reorganization plan because it involved a fundamental managerial or policy decision that is not subject to collective bargaining under section 3504.  The City argues it was only required to meet and confer as to the *impact* of the reorganization plan on PCU members and it fully satisfied that obligation.  We conclude the City's action cannot be parsed in the way it proposes.

*a. Standard of Review*

The PCU sought relief in ordinary mandate, which may issue against a county, city, or other public body, or public officer "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station" (Code Civ. Proc., § 1085, subd. (a)), "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086; see also *Housing Authority v. City of L.A.* (1952) 38 Cal.2d 853, 869-871; *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653).  On review of a trial court's grant or denial of the writ, "we must determine whether its findings and judgment are supported by substantial evidence.  However, where the facts are undisputed and a question of law is involved, we may exercise our independent judgment.  [Citation.]"  (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289.)

Similarly, "The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion.  [Citation.]  The exercise of discretion must be supported by the

12

evidence and, 'to the extent the trial court had to review the evidence to resolve disputed factual issues, and draw inferences from the presented facts, [we] review such factual findings under a substantial evidence standard.' [Citation.] We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge all reasonable inferences to support the trial court's order. [Citation.]" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390.)

Here, there was no statement of decision. "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) We also presume the trial court made all factual findings necessary to support the order, under the doctrine of implied findings. (*Flaedboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 61-62 (*Flaedboe*).) We review this case with those principles in mind.

*b. The MMBA Meet and Confer Requirement Applies*

The MMBA requires a public agency to notify and offer to meet with a recognized employee organization affected by "any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted . . . ." (§ 3504.5, subd. (a).) Section 3504 states, "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." Section 3505 states a public agency "shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment" with representatives of recognized employee organizations and "shall consider fully" the representatives' presentations before making a decision.

13

The purposes of the MMBA are "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations" and "to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by those organizations in their employment relationships with public agencies." (§3500, subd. (a).)

"The duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations over the relevant terms and conditions of employment. [Citation.] The duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse . . . . [Citation.]" (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 537, superseded on another ground as stated in *Coachella Valley Mosquito and Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077.) Although the MMBA requires a public agency to meet and confer in good faith with a genuine desire to reach an agreement, and to fully consider the position of the employee organization, it does not prevent a public agency from implementing proposed changes if the parties fail to reach an agreement. (*Placentia Fire Fighters v. City of Placentia* (1976) 57 Cal.App.3d 9, 27-28.)

*Building Material, supra,* 41 Cal.3d 651, and its progeny guide our review and support the trial court's conclusion the Department's reorganization plan was subject to the MMBA's meet and confer requirement. The trial court could reasonably conclude a major purpose and effect of the plan was to save labor costs by transferring job duties

14

out of a recognized bargaining unit and, as such, would have a significant and adverse effect on wages, hours, or other working conditions. We reject the City's contention the plan implicated only the managerial policy decisions over which a public employer retains discretion to act unilaterally. (§ 3504; *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 611, 616.)

In *Building Material,* the Supreme Court held a public employer's elimination of two positions and creation of new positions in another classification represented by a different collective bargaining unit significantly and adversely affected represented employees, and held the action did not involve a fundamental policy decision. (*Building Material, supra,* 41 Cal.3d at p. 659.) It held that "[f]or an action by an employer to fall within the scope of representation, and thus be subject to the mandatory bargaining requirements of the MMBA, it must have a *significant* effect on the 'wages, hours, and other terms and conditions of employment' of the bargaining-unit employees. [Citations.] It is clear that the permanent transfer of work away from a bargaining unit often has a significant effect on the wages, hours, and working conditions of bargaining-unit employees. [Citations.]" (*Ibid.*)

The Supreme Court observed federal courts interpreting the National Labor Relations Act (29 U.S.C. § 151 et seq.) have held the duty to bargain is triggered when an employer has transferred bargaining-unit work to an independent contractor or "to established or newly hired employees outside the bargaining unit [citations]." (*Building Material, supra,* 41 Cal.3d at pp. 658-659, fn. omitted.) It further observed "California cases have also recognized that the transfer of bargaining-unit work to nonbargaining-unit employees is a proper subject for negotiation. [Citations.]" (*Id*. at p. 661.) The court cited *Dublin Professional Fire Fighters, Local 1885 v. Valley Community Services Dist.* (1975) 45 Cal.App.3d 116, 119 (*Dublin Professional Fire Fighters*), in which "a public employer unilaterally adopted a new policy requiring the use of temporary employees for overtime work, effectively depriving the regular employees of their

15

customary priority in seeking such work." (*Building Material, supra*, 41 Cal.3d at p. 661.) The Supreme Court noted the appellate court in *Dublin Professional Fire Fighters, supra,* 45 Cal.App.3d at page 119, held section 3505 required the employer to meet and confer with employee representatives before the new policy could be implemented because "the workload and compensation of the regular employees were affected." (*Building Material, supra*, 41 Cal.3d at p. 661.)

*Building Material, supra,* 41 Cal.3d at page 659, observed that although the obligation to bargain is required "only if the work transfer adversely affects the bargaining unit in question," it is evident a "bargaining unit is adversely affected when a work transfer results in layoffs or the failure to rehire bargaining-unit workers who would otherwise have been rehired." Adverse effects have been found when bargaining-unit employees have "lost the opportunity to perform overtime or other types of highly paid work [citations] or even when the laid-off employees have been rehired at similar jobs but the bargaining unit itself was reduced in size [citation]." (*Id.* at pp. 659-660.) The Court further noted, "[t]he cases have established that the bargaining unit can be adversely affected without any immediate adverse effect on any particular employee within that unit." (*Id.* at p. 662.)

Even if an action has a significant adverse effect on wages, hours, or working conditions of the bargaining-unit employees, *Building Material, supra,* 41 Cal.3d at page 660, stated an employer may not be required to meet and confer for an action that falls within the "'merits, necessity, or organization'" language of section 3504. The Court explained, "[i]f an action is taken pursuant to a fundamental managerial or policy decision, it is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question. [Citations.]" (*Building Material, supra,* 41 Cal.3d at p. 660.) But when such a decision significantly affects employees' wages, hours, or working conditions, the

16

court stated, "a balancing test applies: the employer's need for unfettered authority in making decisions that strongly affect a firm's profitability is weighed against the benefits to employer-employee relations of bargaining about such decisions. [Citations.]" (*Id.* at p. 663.) The Court held "[t]he decision to transfer bargaining-unit work to nonunit employees in this case had no effect on the services provided by the [employer], but directly affected the wages, hours, and working conditions of [its] employees. Thus, the work transfer was a suitable subject for collective bargaining." (*Id.* at pp. 663-664.)

Subsequently, in *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 628 (*Claremont Police Officers Assn.*), the Supreme Court held: "[T]here is a distinction between an employer's fundamental managerial or policy decision and the implementation of that decision. To determine whether an employer's action implementing a fundamental decision is subject to the meet-and-confer requirement (§ 3505), we employ the test found in our decision in *Building Material . . . .*" *Claremont Police Officers Assn.*, *supra*, 39 Cal.4th at page 636, summarized *Building Material*, stating, in that case, "the city was required to meet and confer [citation] with the Union because the city's transfer of duties to a nonbargaining unit had a significant and adverse effect on the bargaining unit's wages, hours, and working conditions[,]" and its action was not "exempted as a fundamental policy decision because it concerned the effective operation of local government." The Court also acknowledged, "[c]ourts have interpreted 'wages, hours, and other terms and conditions of employment,' which phrase is not statutorily defined, to include the transfer of bargaining unit work to nonunit employees." (*Id*. at p. 631; see also *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 277 ["Under the MMBA, a local public entity that is faced with a decline in revenues or other financial adversity may unilaterally decide to layoff some of its employees to reduce its labor costs. In this situation, a public employer must, however, give its employees an opportunity to bargain over the implementation of the decision,

17

including the number of employees to be laid off, and the timing of the layoffs, as well as the effects of the layoffs on the workload and safety of the remaining employees"].)

Under the reasoning of *Building Material, supra,* 41 Cal.3d 651, the trial court correctly determined the City's reorganization plan was subject to the MMBA's meet and confer requirements. The City attempts to cast *Building Material* as being of "dubious" applicability, because in that case the employer did not meet and confer, whereas in this case the City did. But that begs the question. *Building Material* is controlling on the issue of the scope of the obligation. It plainly is the controlling authority and under its reasoning, the City's reorganization plan was subject to section 3505's meet and confer requirement. The City's plan would eliminate the five upper command positions of captain and lieutenant, which were represented by the PCU, demote some of those officers to sergeant with loss of wages and seniority, and layoff at least one of them. The reorganization plan further would have demoted at least one sergeant, who was in the PCU, to a corporal position, represented by a different bargaining unit, and at a loss of wages and seniority.

 *c. Substantial Evidence Supports the Trial Court's Findings*

We turn then to the trial court's conclusion the City did not satisfy its meet and confer obligations. The City asserts it did meet and confer at meetings in March and April 2012, and it was the PCU that failed to negotiate in good faith. We reject its contention.

"[W]hether a party actually engaged in meetings in good faith is generally a factual question, and the fact-finder's express or implicit determination will be upheld on appeal if supported by substantial evidence. [Citations.]" (*Santa Clara County Correctional Peace Officers' Assn. v. County of Santa* (2014) 224 Cal.App.4th 1016, 1027.) "'In general, good faith is a subjective attitude and requires a genuine desire to reach agreement [citations]. The parties must make a serious attempt to resolve differences and reach a common ground [citation]. The effort required is inconsistent

18

with a "predetermined resolve not to budge from an initial position." [Citations.]' [Citation.] However, adamantly insisting on a position does not necessarily establish bad faith. [Citation.]" (*Id.* at p. 1044.)

Substantial evidence supports the conclusion the City did not meet and confer concerning the reorganization plan in good faith. The PCU presented evidence that it had no notice about the reorganization plan until at a labor concession meeting in early March 2012, the City's human resources manager told Lt. Romero the City wanted to meet with the PCU immediately after that meeting about plans to reorganize the Department. Lt. Romero declined to meet until the PCU's legal counsel could be contacted. A few days later, Chief Twiss wrote PCU's legal counsel telling him about the reorganization plan and indicating he wanted to meet to discuss the reorganization plan. When the PCU's legal counsel replied asking if this was to be a meet and confer within the meaning of the MMBA, the Department's legal counsel informed the PCU there would be no meet and confer regarding the reorganization plan, only about how employees would be effected. After another labor concession meeting on March 27, when PCU leaders asked about the reorganization plan, they were rebuffed by the city manager. On April 3, the City's human resources manager gave the PCU written details about the reorganization plan, and at the meeting on April 3, the city manager told the PCU leadership the reorganization plan would take place no matter what and the PCU had no right to offer a "response" to the plan. The evidence supports the trial court's implied finding the City had no intention of negotiating any sort of agreement with the PCU regarding the reorganization plan and indeed had no intention from the outset of not budging from its plan. In short, substantial evidence supports the trial court's findings in support of issuance of the permanent injunction.

19

*3. Attorney Fees*

The City challenges the trial court's award of attorney fees under Code of Civil Procedure section 1021.5, arguing the PCU failed to establish the statutory requirements for such an award.[4]  We disagree.

Code of Civil Procedure section 1021.5 sets forth California's private attorney general doctrine, which is an exception to the usual rule that each party bears its own attorney fees.  (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147.)  Code of Civil Procedure section 1021.5 provides in relevant part:  "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

We review the trial court's decision to award attorney fees under Code of Civil Procedure section 1021.5 for an abuse of discretion.  (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 578.)  "'""The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.  [Citation.]"'  [Citations.]"  (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)  An abuse of discretion occurs when the exercise of discretion is predicated upon factual findings that are not supported by substantial evidence.  (*Borissoff v. Taylor & Faust* (2004) 33 Cal.4th 523, 531.)

---

[4]        The City does not challenge the amount of fees awarded.

Here, the trial court's minute order contains no express findings pertaining to the requisite Code of Civil Procedure section 1021.5 elements. It only states, "[the PCU] is [the] prevailing party for purposes of attorney fees" and references Code of Civil Procedure section 1021.5 and *Robinson, supra,* 202 Cal.App.4th at page 391. The City cites *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1666-1667, for the proposition the court's failure to provide an express rationale for the award requires reversal. But that was not the holding of that case. It simply held the grounds given by the court must be reviewed for consistency with the applicable law. (*Ibid.*) Here, neither side requested the court make any express factual findings on the requirements of Code of Civil Procedure section 1021.5. The record is silent, and when the record is silent, we infer all findings necessary to support the order. (*Flaedboe, supra,* 150 Cal.App.4th at pp. 61-62.) We conclude the record supports the trial court's implied findings, and thus the court did not abuse its discretion in deciding the PCU was entitled to attorney fees under Code of Civil Procedure section 1021.5.

*a. Enforcement of an Important Right*

The City contends the litigation did not enforce an important right affecting the public interest because all the injunction does is enforce the "nonnovel" meet and confer obligations of the MMBA. The City argues that merely compelling enforcement of a statute law, or "'teaching [the City] a lesson'" as to the scope of its meet and confer obligations, does not suffice.

In *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 (*Woodland Hills*), the California Supreme Court observed both constitutional and statutory rights are capable of qualifying as "important" for purposes of Code of Civil Procedure section 1021.5, although not "*all* statutory rights" are important. (*Woodland Hills, supra,* 23 Cal.3d at p. 935.) The "judiciary [must] exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." (*Ibid.*) "The strength or societal importance of a particular right generally is

21

determined by realistically assessing the significance of that right in terms of its relationship to the achievement of fundamental legislative goals. [Citation.]" (*Robinson*, *supra,* 202 Cal.App.4th at pp. 393-394, citing *Woodland Hills*, *supra,* 23 Cal.3d at p. 936.)

The courts have routinely held litigation enforcing police officers' procedural and labor rights enforces important statutory rights. In *Baggett v. Gates* (1982) 32 Cal.3d 128, 143 (*Baggett*), the Supreme Court held enforcement of the procedural rights and protections contained in the Public Safety Officers Procedural Bill of Rights Act (POBRA) (§§ 3300-3313) was sufficiently important to justify an attorney fees award under Code of Civil Procedure section 1021.5. (See also *Robinson*, *supra,* 202 Cal.App.4th at p. 393 [enforcement of rights and protections under POBRA]; *Riverside Sheriffs' Assn. v. County of Riverside* (2007) 152 Cal.App.4th 414, 422 (*Riverside Sheriffs' Assn.*) [same]; *Aguilar v. Johnson* (1988) 202 Cal.App.3d 241, 246-247 [same]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 846-847 [same].)

Significantly, in *People Ex Rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 594, our Supreme Court held a city must comply with the MMBA meet and confer requirements before proposing an amendment to its city charter affecting terms and conditions of the police officers' employment. It went on to hold the police officers union's litigation to enforce the MMBA meet and confer obligations met *all* the requirements for an award of Code of Civil Procedure section 1021.5 attorney fees, thus implicitly finding public employees' rights under the MMBA are important rights affecting the public interest. (See also *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 12-13, fn. omitted (*Los Angeles Police Protective League*) [meet and confer provisions of MMBA important rights].)

22

In view of the foregoing authorities, we cannot say the trial court abused its discretion in finding the litigation enforced an important right affecting the public interest. Even though the meet and confer obligation was existing, "'"The fact that litigation enforces existing rights does not mean that a substantial benefit to the public cannot result. Attorney fees have consistently been awarded for the enforcement of well-defined, existing obligations. [Citations.]"' [Citation.]" (*Riverside Sheriffs' Assn., supra,* 152 Cal.App.4th at p. 422.) The cases upon which the City relies did not concern the statutes or rights at issue in this case and thus are not authority for the proposition that the meet and confer requirements of the MMBA are not important rights affecting the public interest. (See *Woodland Hills*, *supra,* 23 Cal.3d 917 [citizen group's action challenging city's approval of subdivision map without making requisite finding of consistency with general plan]; *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629 [officer's action for wrongful termination in violation of Fair Employment and Housing Act]; *Angelheart v. City of Burbank* (1991) 232 Cal.App.3d 460 [business owner's action challenging denial of day care home permit in violation of Child Day Care Facilities Act].)

*b. Significant Benefit to Large Class of Persons or General Public*

The City next contends the litigation did not confer a significant benefit on the general public or a large class of persons. It argues the litigation benefitted only the PCU and the individual officers, and at only nine members,[5] the PCU "wouldn't be considered a 'large group' of people in a small room."

_____

5      The City repeatedly asserts there were 12 members remaining in the PCU. It does not explain where that number comes from. The record shows the reorganization plan reduced the membership to nine—the number of sergeant positions that would remain once the captain and four lieutenant positions were eliminated—the new commander would be in the management unit, and sergeants demoted to corporal would be in the rank and file police officers' bargaining unit.

23

The "significant benefit" required by Code of Civil Procedure section 1021.5 need not be tangible or concrete but may be recognized from the effectuation of a fundamental policy. (*Woodland Hills*, *supra,* 23 Cal.3d at p. 939.) The trial court determines the significance of the benefit, and the group receiving it, "from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case. [Citation.]" (*Id.* at pp. 939-940.) The courts are not required to narrowly construe the significant benefit factor. "The 'extent of the public benefit need not be great to justify an attorney fee[s] award.' [Citation.]" (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 894.) And fees may not be denied merely because the primary effect of the litigation was to benefit the individual rather than the public. (*Robinson*, *supra,* 202 Cal.App.4th at p. 396.)

The trial court did not abuse its discretion by finding the litigation conferred a significant benefit on the general public or a large class of persons. There is no statutory requirement that the class be "'readily ascertainable.'" (*Northwest Energetic Services, LLC v. California Franchise Tax BD.* (2008) 159 Cal.App.4th 841, 876, fn. 19.) Furthermore, "evidence of the size of the population benefited by a private suit is not always required. The substantial benefit may be conceptual or doctrinal, and need not be actual and concrete, so long as the public is primarily benefited. [Citation.]" (*Planned Parenthood v. Aakhus* (1993) 14 Cal.App.4th 162, 171.) The trial court could reasonably conclude the litigation benefitted not only the PCU and its members, but also benefitted other employee unions within the City, whose employees the City has stated were being subjected to similar reorganization plans. Moreover, the trial court could reasonably conclude the litigation benefitted the public as well. In *Baggett, supra,* 32 Cal.3d at page 143, the Supreme Court held litigation enforcing police officers' procedural rights under POBRA conferred a significant benefit on the general public by helping to "maintain stable relations between peace officers and their employers and thus to assure effective

24

law enforcement . . . . [Citation.] No one can be heard to protest that effective law enforcement is not a 'significant benefit.'"

c. *Necessity and Financial Burden of Enforcement*

The City also complains the financial burden of private enforcement of the meet and confer requirements of the MMBA does not warrant requiring the City to subsidize this litigation. We disagree.

An award of fees under Code of Civil Procedure section 1021.5 is appropriate when the cost of the claimant's legal victory transcends his personal interest; that is, when the need to pursue the lawsuit placed a burden on the plaintiff ""out of proportion to his individual stake in the matter." [Citation.]'" (*Woodland Hills*, *supra,* 23 Cal.3d at p. 941.) "A court generally determines whether the litigation places a disproportionate burden on the individual by comparing the expected value of the litigation at the time it was commenced with the costs of litigation. [Citation.]" (*Adoption of Joshua S.* (2008) 42 Cal.4th 945, 952.) "The successful litigant's reasonably expected financial benefits are determined by discounting the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made by the probability of success at that time. [Citations.] The resulting value must be compared with the plaintiff's litigation costs actually incurred, including attorney fees, expert witness fees, deposition costs and other expenses. [Citation.] The comparison requires a '"value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case. . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs."' [Citations.]" (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 154-155.)

In its moving papers, the PCU applied the above approach, to estimate that at the outset of the litigation there was a potential for a $21,750 financial gain, based on the assumption the litigation would at least delay the reorganization for one year. It reasoned the five command positions slated for elimination equated to approximately $6,000 in membership dues (at about $1,200 annual dues per member), and salary differential for those five officers could be as high as $7,500 per year, for a total potential financial gain of $43,500. The PCU posited there was a 50/50 chance of prevailing in the litigation and thus discount the potential gain by half. The PCU argued that balanced against the $50,000 litigation costs, the burden was disproportionate.

The City does not address the PCU's numbers but based on even lower numbers argues the financial gain to the PCU (and officers) should preclude the attorney fees award. The City argues the individual plaintiffs had a significant financial stake in the litigation due to potential salary reductions. In its brief, the City asserts Lt. Romero received a *significant* benefit because the salary differential between his lieutenant's pay and a sergeant was $416.95 annually. It asserts the salary difference to Sgt. Hamilton if demoted to corporal would be $542.05 annually, again a significant monetary benefit. In is not clear where the City's numbers come from. The City cites "exhibit C" in its motion to augment the record, which is the City's 13-page memorandum of points and authorities in opposition to the attorney fees motion. It does not cite to any page within that document. We have reviewed the exhibit and the numbers the City asserts are nowhere to be found—the document does not appear to contain any information concerning officers' salaries. The officers' declarations contained in the PCU's moving papers do specify the salary ranges for the various positions. We assume the City's relatively modest numbers account for where the officers would be placed within the salary range—i.e., if the officer was at the lower end for the higher rank, he would be moving into the higher end of the salary range for the lesser rank. In any event, based on

26

the relatively meager salary benefits the City asserts, we cannot say the trial court was obligated to find those salary savings in any way offset the $50,000 in litigation costs.

The City also contends the PCU was not unduly burdened by the costs of this litigation. It cites *Compton Community College Etc. Teachers v. Compton Community College Dist.* (1985) 165 Cal.App.3d 82 (*Compton Community College Teachers*), for the proposition that a union should not be awarded Code of Civil Procedure section 1021.5 attorney fees because its entire "*raison d'être*" is to do exactly what it did in this case—enforce the rights of its members. In that case, the court did indeed conclude the appellant teachers' union had failed to establish on appeal an entitlement to private attorney general attorney fees and remanded the matter to the trial court. In so doing, it observed that "in this case the appellant is a union. One of the functions of unions is to provide legal counsel to enforce the terms of contracts they sign on behalf of their members. This essentially is what was involved in the instant case. The subject of the litigation was enforcement of the salary clauses in the union's contract. The primary beneficiaries of the litigation-including the appeal-are the members of the appellant union. [¶] Appellant made no showing the legal costs were extraordinarily large or the union so small it lacked the funds to protect its members' interests in the courts." (*Compton Community College Teachers, supra,* 165 Cal.App.3d at p. 98.)

But the next year, in *Los Angeles Police Protective League, supra,* 188 Cal.App.3d 1, the same panel held the police officers' union *was* entitled to Code of Civil Procedure section 1021.5 attorney fees in litigation enforcing meet and confer requirements of the MMBA. The court clarified the quoted language from its *Compton Community College Teachers* opinion was not a "hold[ing] that merely because a union was involved it would be foreclosed from receiving an attorney fee award. Rather we remanded the case to the trial court to take evidence and make findings on this

27

question and to determine 'whether appellant union is entitled to attorney fees and if so, how much.' [Citation.]" (*Los Angeles Police Protective League, supra,* 188 Cal.App.3d at p. 16.) It clarified that in determining if the union was entitled to an award, the trial court must consider factors such as "whether the benefits to nonlitigants were large in relation to the benefits received by the union membership thus justifying the attorney fee award as a means of encouraging similar suits, and whether it was a situation where the legal costs were so high and litigants' benefits so modest there would be no net recovery or a very small one unless the union were to receive an attorney fee[s] award. [Citation.]" (*Id.* at pp. 16-17.)

Here, we cannot say the trial court abused its discretion in finding the balancing favored the PCU. As the City observes the PCU is a very small union—14 members when the reorganization plan was announced, reduced to nine by the reorganization. The record shows the annual membership dues were $887.16, and thus the litigation costs (over $50,000) represents well over six years' worth of membership dues. In view of the significant benefit the litigation conferred on the larger group of City employees and the general public as described above, we cannot say the attorney fees award was in error.

*4. Attorney Fees on Appeal*

"'[I]t is established that fees, if recoverable at all—pursuant either to statute or parties' agreement—are available for services at trial *and on appeal*.' [Citations.]" (*Morcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927.) The PCU is thus entitled to attorney fees under Code of Civil Procedure section 1021.5 as the successful party on appeal. (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1356 (*Lyons*).) "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees. . . . " (*Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498; see also *Lyons, supra,* 136 Cal.App.4th at pp. 1356-1357.)

28

DISPOSITION

The judgment and postjudgment order are affirmed. Respondents are awarded their attorney fees and costs on appeal. The matter is remanded to the trial court with directions to determine a reasonable award for attorney fees on this appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

29