Filed 6/5/20; Certified for Publication 6/29/20

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | 2d Civil No. B293153<br>(Super. Ct. No. 16CV04758)<br>(Santa Barbara County) |

      John Doe (Doe) was admitted as a freshman student to the University of California at Santa Barbara (UCSB). Before he even arrived in Santa Barbara, UCSB placed him on interim suspension pending its investigation into an allegation of dating-

relationship violence. UCSB then delayed completion of the investigation, in violation of its own written policies.

Doe brought this action against the Regents of the University of California (Regents). The superior court preliminarily enjoined the interim suspension pending completion of the administrative proceedings. Ultimately, Doe was exonerated in the administrative proceedings. Over his objection, the superior court then dismissed his action as moot. The court denied Doe's motion for attorney's fees under Code of Civil Procedure section 1021.5, reasoning that he had failed to show the litigation conferred "a significant benefit . . . on the general public or a large class of persons." (Code Civ. Proc., § 1021.5.)[1]

Doe appeals from the judgment of dismissal and the postjudgment order denying his motion for attorney's fees. We affirm the order of dismissal. We conclude Doe satisfied the criteria for an award of fees under section 1021.5. We reverse the denial of the fee motion and remand for a determination of the amount to be awarded.

*Factual and Procedural Background*

At the age of 17, Doe was admitted to UCSB. He was assigned a dormitory and was registered to begin classes on September 23, 2016. On August 13, 2016, he was involved in a verbal argument with his then 17-year-old girlfriend, Jane, after he discovered she had hacked into his social media accounts. Both Doe and Jane resided in San Diego County, and the incident occurred in the City of San Diego. Jane was not a student at UCSB. When Doe observed Jane videotaping their argument

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

with her cell phone, there was a scuffle for the phone. The video left the impression that Doe might have hit her, which Doe denied. Doe contended Jane was a very jealous person and after the incident repeatedly threatened to make the video recording public if he had any social contact with female students at UCSB.

In late August 2016, before classes had begun, Doe attended a week-long orientation program at UCSB for incoming freshman. When he returned to San Diego, Jane accused him of flirting with another young woman. On August 25, 2016, Jane posted on her public Twitter account an edited 19-second version of the video recording in which it appeared that Doe had hit her, as the video goes dark. On the Twitter post, Jane stated she was posting the video to protect other women from being battered.

A student at UCSB saw the post on Twitter and notified UCSB's Office of Student Affairs, which then forwarded the information to the campus police department. On August 30, 2016, a detective from UCSB's campus police department drove from Santa Barbara to San Diego to arrest and transport Doe to a juvenile detention facility in San Diego. That same day, UCSB's Vice Chancellor of Student Affairs, Margaret Klawunn, issued an interim suspension order and had it delivered to Doe while he was being fingerprinted at the juvenile facility in San Diego. The order barred him from entering the UCSB campus on the ground that he posed a threat to the safety of the campus community. He was also notified the allegation of relationship violence would be investigated by UCSB's Title IX office.

The interim suspension was imposed pursuant to section 105.08 of the University of California policies governing student conduct (PACAOS) and section III (3)(D) of the University of California's Policy on Sexual Violence and Sexual

Harassment. (PACAOS Appendix E.) These policies authorize UCSB, pending a final determination on an alleged violation, to "take interim measures as appropriate to ensure the safety, well-being, and equal access to University programs and activities of its students." (PACAOS Appendix E, § III(3)(D).)

Pursuant to PACAOS section 105.08, interim suspensions may include exclusion from classes, other specified activities, or areas of campus. Section 105.08 provides: "A student shall be restricted *only to the minimum extent necessary* when there is reasonable cause to believe that the student's participation in University activities or presence at specified areas of the campus *will lead* to physical abuse, threats of violence, or conduct that threatens the health or safety of any person on University property." (PACAOS, § 105.08, italics added.) Section 105.08 further provides that a student placed on interim suspension shall be given prompt notice of the charges, the duration of the suspension, and the opportunity for a prompt hearing on the suspension, and that the "[i]nterim suspension shall be reviewed by the Chancellor within twenty-four hours."

On September 2, 2016, the San Diego County Superior Court, Juvenile Division, found that Doe was not a threat to anyone, including Jane, and ordered him released to the custody of his mother. By September 14, 2016, two of the three charges against Doe had been dismissed by the district attorney. Doe notified UCSB that the juvenile court had found he was not a threat to anyone, but no action was taken by the University. Instead, a hearing was scheduled for September 16, 2016, to address Doe's request to set aside the interim suspension order so he could move into his freshman dorm the next day.

4.

Doe attended the hearing, along with his attorney, and testified. Although he was told a decision would be made at the end of the hearing, that did not happen. Rather, in a letter dated September 22, 2016, Vice Chancellor Klawunn notified Doe that the interim suspension order would remain in effect pending completion of UCSB's Title IX investigation. Doe was barred from campus, campus housing, attending classes (including online classes), and participating in UCSB activities.

In October 2016, the San Diego County Juvenile Court dismissed the remaining charge against Doe after Jane admitted he had never hit her. Notwithstanding the dismissal of criminal charges, UCSB continued the interim suspension while it conducted its own investigation.

UCSB's policies on Sexual Violence and Sexual Harassment prescribe the procedures governing the investigation and adjudication of student misconduct. The policies require a "prompt, fair, and impartial resolution" of reports of sexual violence. The policies further provide that the investigation shall be completed within sixty (60) business days, and the entire Title IX process, including all administrative appeals, shall be completed "within 120 business days from the date of Title IX's receipt of a report." (PACAOS Appendix E, §§ III(1) & III(3)(J); U.C. Policy – Sexual Violence & Sexual Harassment (2015) § V(A)(4)(b).) Extensions are permitted only on a showing of good cause and must be documented. UCSB's policies have the force and effect of statutory law. (*Kim v. Regents of University of California* (2000) 80 Cal.App.4th 160, 165.)

On October 21, 2016, Doe filed suit against the Regents in the superior court, alleging claims for administrative mandate (§ 1094.5), ordinary writ of mandate (§ 1085), and

injunctive and declaratory relief.  He sought termination of the interim suspension and reinstatement as a student at UCSB.

In December of 2016, Doe sought a preliminary injunction of the suspension order so he could attend classes at the beginning of the second quarter on January 6, 2017.  On January 3, 2017, the superior court denied the motion on procedural grounds, concluding that mandamus relief was unavailable because Doe had an adequate remedy at law through the administrative process at UCSB and had not exhausted his administrative remedies.

On February 3, 2017, Doe sought a writ of mandate in this court compelling the superior court to preliminarily enjoin the enforcement of his interim suspension pending completion of the Title IX investigation and administrative process.  By then, UCSB had exceeded the 60-day time period set forth in its own rules, and had yet to complete its investigation.  The interim suspension had already spanned two academic quarters and it appeared it would continue through the remainder of Doe's freshman year.  Doe was precluded from exhausting his administrative remedies due to UCSB's delay in completing the Title IX investigation, in violation of its own policies.

On March 13, 2017, this court issued a suggestive *Palma* notice, stating that the superior court might wish to reconsider its order denying Doe's request for a preliminary injunction.[2]  It appeared that Doe did not have an adequate remedy at law because UCSB's policies did not provide an avenue for compelling completion of the Title IX investigation so he could

---

[2] See *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-183; *Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1248-1250.

exhaust his administrative remedies.  Doe had missed over half of his freshman year of college, there were no charges pending against him (civil or criminal), and no complaint had been filed against him at UCSB.

On March 21, 2017, the superior court conducted a rehearing on Doe's motion for a preliminary injunction.  UCSB confirmed that it still had not completed its Title IX investigation.  In an effort to show that Doe was not likely to prevail on his claims, UCSB offered "new evidence," i.e., two emails dated August 29 and September 19, 2016, written by a campus security officer and sent to the Office of Judicial Affairs.  These emails purported to summarize another officer's reports and contained multiple hearsay statements allegedly made by Doe and Jane.  UCSB had relied on the email summaries in imposing the interim suspension, but had not disclosed their contents to Doe until months later during the injunction proceedings.  Doe vigorously disputed the credibility of the email summaries and argued he had been denied due process by UCSB's failure to disclose them.

At the conclusion of the hearing, the superior court granted Doe's motion and preliminarily enjoined UCSB from enforcing the interim suspension order.  The court also stayed the suspension pursuant to section 1094.5, subdivision (g).  The court found Doe was likely to prevail on the merits of his claims that he had been denied due process by UCSB's delay in the Title IX investigation, its failure to consider less restrictive interim measures while the investigative process dragged on, and by withholding critical evidence.

The superior court found UCSB's investigation had extended far beyond the time period (120 business days) which,

7.

under its policies, the entire Title IX process, including administrative appeals, should have concluded. The court noted that, even after more than 200 days, UCSB had "done nothing to advance the investigation beyond interviewing [Doe]." The court stated the record before it "reflects that no other interviews had been performed," including contacting Jane to corroborate statements attributed to her. The court found that UCSB offered "no viable or reasonable explanation" as to why the investigation was not complete. The court found the delay "unreasonable and arbitrary," and the interim suspension "particularly egregious" given UCSB's delay in completion of its Title IX investigation in violation of its own policies, the dismissal of the juvenile court proceedings, and the seven-month interruption in Doe's education caused by UCSB's inability or unwillingness to conclude its investigation.

The superior court further found that UCSB had failed to show that it had considered less restrictive interim measures, as required by UCSB's policies (PACAOS section 105.08).[3] The court stated that UCSB had issued an interim suspension that was unlimited in both duration and scope, without considering any less restrictive interim measures that might have allowed Doe to continue his education while the investigation proceeded, and then "inexplicably allowed the investigation to drag on for months beyond the governing timelines." The court noted Doe had no administrative remedy to

---

[3] Under UCSB's policies governing student conduct, lesser restrictive measures include warnings or censure, no contact orders, probation, loss of privileges and activities, exclusion from specified areas on campus, community service, and fines. (PACAOS, §§ 105.00-105.11; PACAOS Appendix E, § III(3)(D).)

compel the Regents to complete the Title IX process and determine whether disciplinary charges would even be made against him.

The superior court went on to state: "[The Regents's] argument that due process does not require production of all evidence at the interim suspension stage is irreconcilable with the nature and seriousness of the entire process at hand. . . . Doe is entitled to know all the information against him at the hearing . . . . [It] is patently obvious to this Court, [Doe] was seriously prejudiced by the use of [the undisclosed detective's] summaries."

With respect to the relative harm to the parties resulting from issuance or non-issuance of injunctive relief, the superior court found that Doe had made a compelling showing of irreparable harm. The court noted that, absent injunctive relief, Doe would miss his entire freshman year because UCSB still had not completed its investigation, in violation of its own policies. The court stated, "Nothing in this record suggests that the investigation is complex or requires extraordinary time to complete; the only reasonable inference is to the contrary." The court stated that Doe's education was on hold, he was precluded from taking online courses at UCSB or attending community college unless he withdrew from UCSB, and he had incurred substantial attorney's fees and costs during the interim suspension. The court concluded: "[T]he University is intentionally doing indirectly what it is unwilling to do directly. The University has made a decision to deny John Doe the opportunity to enroll in any of the first three quarters of his freshman year. But instead of making the decision based upon the facts, the law, and in fairness, it has decided to do it their own way."

The superior court ordered that the preliminary injunction and stay would continue in effect through the conclusion of the administrative process and judicial review (if any).  It ordered UCSB to take specific measures to assist Doe's assimilation into school, consistent with UCSB's policies.

UCSB then ended the interim suspension, reinstated Doe as an enrolled student for the spring quarter of 2017, and assisted him with obtaining on-campus housing.

On May 16, 2017, the Regents appealed the superior court's order granting the preliminary injunction to this court. (*Doe v. Regents of the University of California* (Super. Ct., Santa Barbara County, 16CV04758, B282663).)

Thereafter, in November of 2017, UCSB completed its Title IX investigation.  On November 17, 2017, the Title IX Office recommended that Doe be found responsible for violating UCSB's Sexual Violence/Sexual Harassment policy prohibiting dating violence.  The Office of Judicial Affairs (OJA) accepted the recommendation and ordered that Doe be suspended from UCSB for two years.

Doe then appealed the OJA's decision to UCSB's Interpersonal Violence Appellate Review Committee (IPVARC). On April 4, 2018, IPVARC conducted a hearing at which Doe presented evidence as to why he was not responsible for the charge of dating violence.  On April 18, 2018, IPVARC found that Doe was not responsible for dating violence, but was responsible for violating UCSB's Student Conduct Code for making threats to Jane.  The IPVARC modified the proposed disciplinary sanction to provide Doe with credit for time served during his interim suspension, so that Doe would not face any further suspension.

Doe then appealed IPVARC's decision to UCSB's Vice Chancellor of Student Affairs (Margaret Klawunn). After Doe contended the Vice Chancellor had a conflict, Dean Jeffrey Milem was appointed to review the appeal.

On May 21, 2018, Dean Milem reversed IPVARC's decision that Doe had violated UCSB's Student Conduct Code. Dean Milem concluded that Doe had not been given adequate notice of the threat charge. Dean Milem also reversed the disciplinary sanction. According to the declaration of UCSB's Associate Dean of Students, Suzanne Perkin, who oversees the OJA at UCSB, Doe was found "not responsible for violating any provision of University policy arising from this matter, he has received no sanction, and he never will." Ms. Perkins further declared that UCSB decided not to charge Doe with any further policy violations arising from the incident and declined to pursue the matter any further.

On June 22, 2018, after UCSB determined it would not pursue this matter any further, the Regents filed a request in this court to voluntarily dismiss their appeal of the preliminary injunction in B282663. By that time, Doe's counsel had already incurred the expenses of briefing the appeal. On June 27, 2018, this court dismissed the Regents's appeal and issued the remittitur.

Thereafter, on June 29, 2018, the Regents filed a motion in the superior court to dismiss Doe's action as moot, contending there were no justiciable controversies remaining in the action. The Regents argued that Doe sought three forms of relief in his pleadings: termination of the interim suspension, reinstatement as an enrolled student, and removal of any reference to the interim suspension in his student records. Doe

prevailed in the administrative proceedings, was reinstated as an enrolled student, and had obtained the available relief sought in his first amended complaint.

In declarations submitted in support of its motion, the Dean of Students (Suzanne Perkins) confirmed that Doe's UCSB records "were devoid of any notation that he [had] been sanctioned." Miles Ashlock, Acting Associate Dean of Student Life at UCSB, also confirmed that "[n]owhere on [Doe's] official transcript does it state he is subject to interim suspension or discipline arising from the . . . incident." Ashlock explained that while prospective academic institutions and employers do not typically inquire whether a student has ever been placed on interim suspension, if such an inquiry was made regarding Doe, UCSB's response would be "No," due to the superior court's March 21, 2017, preliminary injunction "reversing" the interim suspension.

On July 23, 2018, Doe filed a second amended petition and complaint in the superior court, asserting the same causes of action as his prior pleadings and an additional claim alleging that UCSB had violated his right to privacy after its Title IX office had sent his confidential disciplinary file to a third party (Mary Beth), who UCSB had mistakenly concluded was Jane.

On July 25, 2018, Doe opposed the Regents's motion to dismiss, arguing the action was not moot because the interim suspension order had never been formally reversed, there had been "additional wrongs directed at [Doe]," and the second amended complaint was the operative pleading with justiciable controversies remaining. Doe wanted the superior court to issue a writ "commanding that [the interim suspension order] be

12.

reversed so that his name will be cleared and he can go through life without having to say that he was suspended for conduct issues." Doe continued: "His interim suspension was premised upon violation of policies and an actual finding [by Vice Chancellor Klawunn] that he was *a threat to the safety of the community*. [He] cannot have this on his record."

On August 7, 2018, in a minute order, the superior court granted UCSB's motion and dismissed the action as moot.[4] The court ruled that Doe did not have leave to amend to add claims that arose after the filing of the earlier pleadings, but regardless of which pleading was the operative one the action was moot. The court concluded there was no relief remaining for the court to give either in mandamus or by way of declaratory relief.

The superior court stated: "Doe insists that the suspension order was not 'reversed.' This is a semantic argument. The interim suspension was just that – interim. This Court enjoined it, rendering it ineffective. And, upon final determination in Doe's favor, the interim suspension had no effect. . . . [¶] Doe wants the Court to remove all record of the suspension order from [UCSB's] files. He says that other educational institutions and potential employers could learn of the interim suspension. Regents'[s] evidence establishes that this is not the case. . . . Prospective academic institutions and employers do not typically inquire whether a student has ever

_____

[4] Doe filed a notice of appeal from the unsigned minute order. We deem the order to incorporate a judgment of dismissal and will review the order in the interest of judicial economy and justice. (*Yee v. Cheung* (2013) 220 Cal.App.4th 184, 192, fn. 5.)

been placed on interim suspension.  If they did, UCSB's response would be 'No,' due to this Court's March 21, 2017, order. . . . Doe's official UCSB transcript contains no reference to the interim suspension or any discipline."

Thereafter, Doe filed a motion for an award of attorney's fees under the private attorney general doctrine codified in section 1021.5.  Doe's counsel sought $265,508, representing fees incurred from the inception of the case (August 30, 2016) through the superior court's order of March 21, 2017, preliminarily enjoining Doe's interim suspension.  This figure also included fees and costs related to the Regents's appeal of the March 21, 2017, preliminary injunction, which the Regents voluntarily dismissed, and the time incurred in preparing the motion for attorney's fees.  Doe's counsel stated that he expended over $135,000 in additional time and costs during the administrative proceedings after March 21, 2017, but was not requesting an award of fees for those services.  Doe's counsel requested the fees be increased by a multiplier of 1.6.

Following a hearing, the superior court denied the motion, concluding Doe had failed to satisfy two of the four criteria required for an award of fees under section 1021.5. Specifically, the court concluded that Doe had failed to demonstrate that his action conferred a significant benefit on the general public or a large class of persons, and it was questionable whether the necessity and financial burden of private enforcement were such as to make the award appropriate.

*Dismissal of Doe's Action as Moot*

Doe first contends the superior court erred in granting the Regents's motion to dismiss his action as moot.  He argues the action is not moot because the interim suspension

14.

order was never reversed or vacated. UCSB was preliminarily enjoined from continued enforcement of the interim suspension order pending completion of the administrative process. He argues that when he was cleared in the administrative process on the relationship violence charge, UCSB "did *nothing* to clear, vacate, or reverse the Interim Suspension Order which was a distinct administrative charge (premised upon being a threat to the safety of all students)." He believes it remains on his record and is a suspension he will have to answer for whenever asked. He argues that until the order is vacated, it "is *res judicata* on that issue . . . between these parties."

"A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' [Citation.] . . . The pivotal question in determining if a case is moot is . . . whether the court can grant the plaintiff any effectual relief. [Citations.]" (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) "We review mootness, a question of law, de novo." (*Biodiversity Legal Foundation v. Badgley* (9th Cir. 2002) 309 F.3d 1166, 1173.) We "apply the substantial evidence standard to . . . [the] court's findings of fact." (*SFPP v. Burlington Northern & Santa Fe Railway Co.* (2004) 121 Cal.App.4th 452, 461.)

Because the superior court could not grant Doe effectual relief on any of his claims, it did not err in dismissing the action as moot. UCSB cleared Doe of any wrongdoing, thereby overturning former Vice Chancellor Klawunn's conclusion that his "presence on the UCSB campus poses a threat to the health and safety of the University community." Additionally, Doe's official transcript does not show the interim

15.

suspension.  The court credited Ashlock's declaration that if in the future anyone were to inquire whether Doe had been placed on interim suspension, UCSB's response would be "No." "Credibility is an issue for the fact finder. . . .  [W]e do not reweigh evidence or reassess the credibility of witnesses." (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.)

Moreover, the interim suspension was rendered inoperative by the superior court's order staying and preliminarily enjoining the suspension "through the conclusion of the entire administrative process."  Therefore, in the unlikely event Doe is asked if he was ever placed on interim suspension, he can legitimately answer, "No."  In these circumstances, the continuation of Doe's lawsuit would result in a waste of judicial resources and a needless expense for the parties.

The doctrine of res judicata is inapplicable.  "'Res judicata' describes the preclusive effect of a final judgment on the merits."  (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.)  Res judicata may apply "[w]here judicial review is not sought and the administrative decision becomes final . . . ." (*California Coastal Com. v. Superior Court* (1989) 210 Cal.App.3d 1488, 1493.)  Here, the interim suspension order was what it purported to be, i.e., a provisional or temporary order, not a "final" order.

*The Superior Court's Order Denying Attorney's Fees*

Doe contends the superior court applied the wrong standard in denying his motion for attorney's fees and was misled by the Regents's counsel as to the impact and significance of his litigation.

16.

To obtain attorney's fees in this context under section 1021.5, the moving party must establish that: (1) it is "a successful party" in an "action"; (2) the action "has resulted in the enforcement of an important right affecting the public interest"; (3) the action has conferred "a significant benefit, whether pecuniary or nonpecuniary, . . . on the general public or a large class of persons"; and (4) the necessity and financial burden of private enforcement are such as to make the award appropriate. (§ 1021.5.)

"'[T]he private attorney general doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." Thus, the fundamental objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases.' [Citation.]" (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565.)

We review a superior court's ruling on a motion for attorney fees under section 1021.5 for abuse of discretion, but de novo review is warranted where the determination of whether the statutory criteria were satisfied ""amounts to statutory construction and a question of law.""" (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213 (*Whitley*).)

"Because of the prominence of legal questions in applying the criteria of section 1021.5, some appellate courts have conducted their review using a two-step approach. First, the appellate court considers whether the superior court applied

17.

the proper legal standards in reaching its determination. [Citation.] If the superior court's order is not consistent with the applicable principles of law, the order necessarily falls outside the scope of the superior court's discretion. [Citation.] In completing this step of the inquiry, an appellate court must pay particular attention to the superior court's stated reasons for denying fees. [Citation.] [¶] Second, if the superior court applied the proper legal standards, the appellate court determines whether the result was within the range of the superior court's discretion—that is, whether there was a reasonable basis for the decision. [Citation.] The range of discretion granted to superior courts by section 1021.5's use of the permissive term 'may' is limited. [Citation.] Specifically, attorney fees must be awarded when the statutory criteria are met unless special circumstances render such an award unjust. [Citation.] This limitation on the superior court's discretion and the fact that the application of the statutory criteria often presents reviewing courts with questions of law are the reasons for the number of appellate decisions in which a superior court's denial of attorney's fees under section 1021.5 has been reversed." (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 391.)

*Successful Party and Enforcement of an Important Right*

The parties do not dispute that Doe satisfies the first element under section 1021.5 – he was the successful party. Indeed, as the superior court found, Doe achieved all of his objectives in the litigation.

Nor do the parties dispute that Doe's litigation enforced an important right. "Courts have broadly interpreted the important right concept" to encompass constitutional rights as well as statutory rights that further "important" rather than

18.

"trivial or peripheral public policies." (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 988; *Bell v. Vista Unified School District* (2000) 82 Cal.App.4th 672, 690.)

The superior court found that Doe's action enforced important due process rights in student disciplinary proceedings, i.e., requiring USCB to comply with its own policies and procedures. (See *Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1238; *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 318 (*Press*) ["Attorney fees have consistently been awarded for the enforcement of well-defined, existing obligations"].) The court necessarily found, and we agree, that this is not a trivial right. We also note that the important right and significant benefit element, discussed below, "to some extent dovetail." (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, 1158.)

*Conferring a Significant Benefit on a Large Class of Persons*

The third element under section 1021.5 is satisfied when the lawsuit has conferred a significant benefit on the general public or a large class of persons. The superior court determines "the significance of the benefit, as well as the size of the class receiving [that] benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939-940 (*Woodland Hills*).)

Like the important right element, courts have broadly construed the significant benefit element. (See Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 3d ed. 2020), §§ 3.40, 3.51.) For a benefit to be significant, the "extent of the public

19.

benefit" from the lawsuit must be substantial but "need not be great." (*RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 781.) The benefit need not be monetary, and "need not represent a 'tangible' asset or a 'concrete' gain . . . ." (*Woodland Hills*, *supra*, 23 Cal.3d at p. 939; § 1021.5 [defining "a significant benefit" as either "pecuniary or nonpecuniary"]; *Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1011 ["the benefit may be conceptual or doctrinal and need not be actual [or] concrete"].) As our Supreme Court has noted, "the effectuation of a fundamental constitutional or statutory policy" can itself constitute a significant benefit. (*Woodland Hills*, *supra*, at p. 939.) Moreover, "fees may not be denied merely because the primary effect of the litigation was to benefit the individual rather than the public." (*Indio Police Command Unit Assn. v. City of Indio* (2014) 230 Cal.App.4th 521, 543 (*Indio*).)

The superior court concluded that Doe had failed to satisfy the significant benefit element because the relief sought and obtained in his action "was inherently personal in nature, involving the termination of his interim suspension and reinstatement as an active, full-time student pending the conclusion of the investigation." Focusing on section 105.08 of the Policies of Student Conduct (requiring that interim disciplinary measures restrict the accused student only to the minimum extent necessary), the court found there was no evidence to support the conclusion that Doe's action resulted in a revision or revocation of the rule, or that there was widespread misapplication of the rule, such that a large class of persons could potentially be impacted.

20.

The superior court concluded: "After a realistic assessment of the gains which have resulted from [Doe's] action, there is no evidence before this Court to support the existence of any articulable significant benefit to . . . a large class of persons, or in fact any benefit other than that which is inherent in any action in which illegal or improper conduct is rectified . . . . The gains which were achieved by [Doe's] action were entirely personal, and any other benefits achieved were incidental to [Doe's] personal stake."

Doe contends that his action effectuated important constitutional and statutory due process rights, and conferred a benefit on all students attending UCSB. He argues the superior court misinterpreted section 1021.5 by focusing primarily on his personal interest in bringing the litigation, as opposed to the significance of the constitutional due process rights that were enforced, and that this misinterpretation "drove the denial of fees." We agree.

Here, UCSB's written policies require prompt and timely investigation of complaints for sexual harassment and sexual violence. The superior court found that UCSB had failed to follow its own policies and procedures in issuing the interim suspension and violated Doe's constitutional right to due process. The court found the interim suspension was egregious given UCSB's delay in completion of the Title IX investigation. Doe's action held the university accountable for its violation of these policies and enjoined an indefinite interim suspension issued in violation of those rules. The action enforced a student's right to have the university comply with its own policies governing the time limits for resolving Title IX complaints and investigations. It confirmed the availability of injunctive relief to prohibit an

21.

interim suspension where the university unreasonably delays completion of a Title IX investigation, fails to consider less restrictive measures, and conceals critical evidence utilized in issuing the interim suspension order, all in violation of UCSB's policies.

"Litigation which enforces constitutional rights necessarily affects the public interest and confers a significant benefit upon the general public." (*City of Fresno v. Press Communications, Inc.* (1994) 31 Cal.App.4th 32, 44, citing *Press, supra*, 34 Cal.3d at p. 318.) "While these rights are by nature individual rights, their enforcement benefits society as a whole." (*Press, supra*, at p. 319.)

Here, the superior court narrowly construed the significant benefit element and gave insufficient recognition to the significance of the due process rights that were effectuated and the extent of the public benefit. All students at a university are benefitted when it is required to follow its own policies and procedures. A lawsuit that forces an entity to follow its own rules can confer a significant benefit. (See *Doe v. Westmont College* (2019) 34 Cal.App.5th 622, 640 [requiring university to comply with its own written policies "benefits students accused of sexual misconduct, victims, and colleges alike"]; *Indio, supra*, 230 Cal.App.4th at p. 541.)

Further, a party may provide evidence to substantiate the significance of the benefit of his lawsuit, but he is not obligated to do so under section 1021.5. It is enough if the superior court could reasonably conclude that the significant benefit conferred by the action would reach a large group of people. (*Boatworks, LLC v. City of Alameda* (2019) 35

Cal.App.5th 290, 308 [looking at what the superior court could conclude].)

Doe's action and the injunction he obtained will provide a significant benefit to a large group of people. The injunction should deter UCSB from violating its policies requiring prompt resolution of Title IX allegations, particularly where interim suspensions are issued. The deterrent effect of the injunction will benefit all students at UCSB, including those similarly situated to Doe, who will be assured that, once enrolled at a public university, they will not be unreasonably, arbitrarily, and indefinitely suspended in violation of the university's own policies. (See *Press, supra*, 34 Cal.3d at pp. 320-321 [deterrent effect of injunction satisfied significant public benefit element of private attorney general fees under C.C.P. section 1021.5]; *MBNA American Bank N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 10 [same].) Contrary to the Regents's contention, the benefit to the campus community from the injunction in this case cannot be described as "minuscule."

Additionally, the superior court performed its analysis of the benefits of Doe's action without access to "all of the pertinent circumstances" available. (*Woodland Hills*, *supra*, 23 Cal.3d at pp. 939-940.) In support of his fee motion, Doe submitted evidence that the Department of Education had accepted review of his complaint concerning UCSB's delay in completion of the Title IX investigation and issuance of an interim suspension without considering lesser measures. He notified the Department of Education of the superior court's injunction. The superior court found this evidence unpersuasive, stating: "[T]hat an agency . . . has said that it will look into [Doe's] matter does not provide evidence that gives rise to any

23.

conclusion that [Doe's] proceeding – filed to achieve inherently personal relief – has conferred a significant benefit upon a large class of persons."[5]

Doe also submitted the declaration of N.N., a female USCB student who, like Doe, had also been the subject of an interim suspension prolonged by a lengthy, delayed Title IX investigation. In her declaration, she stated that she attended the superior court's hearing in March of 2017, when the court issued the preliminary injunction enjoining Doe's interim suspension. She declared that Doe's litigation motivated her to fight her interim suspension and file her own complaint with the Department of Education in May of 2017. Her complaint addressed, among other things, UCSB's delay in completing Title IX investigations, the same reason Doe's interim suspension had been enjoined and the identical claim Doe made in his complaint with the Department of Education. She referenced Doe's action in her complaint.

N.N.'s complaint was resolved on September 27, 2018, when UCSB entered into a Resolution Agreement with the Department of Education.[6] In the agreement, UCSB agreed to promptly resolve future Title IX investigations, particularly in situations in which a student has been subject to an interim suspension. UCSB also agreed to provide documentation to the

---

[5] Ultimately, according to the parties, Doe's complaint was not resolved by the Department of Education due to the pending litigation in this case.

[6] This court granted Doe's request to take judicial notice of the Resolution Agreement dated September 27, 2018, entered into between UCSB and the United States Department of Education, Office for Civil Rights. (Evid. Code, §§ 452, subd. (c), 459.)

Department of Education showing its compliance, and provide training for its employees on how to comply with the time limits for Title IX allegations and ensure that UCSB is tracking "promptness."[7]

Although the superior court had the declaration of N.N before it during the hearing on Doe's fee motion on October 23, 2018, the court was unaware of the existence of the Resolution Agreement. Contrary to the statements in N.N.'s declaration, the Regents's counsel argued in its written opposition to Doe's motion that there was "no evidence suggesting [Doe's] case even slightly influenced [N.N.'s]." At the hearing on the fee motion, the Regents's counsel added: "Just for the record . . . anyone can file a complaint for a federal investigation with the [Office of Civil Rights]. As we know, anyone can file a lawsuit. *There has been no outcome to suggest that the filing of a complaint with the Office of Civil Rights somehow inures to the benefit of separate litigation that has nothing to do with the investigation or justifies an award of fees.*"

---

[7] In particular, the Resolution Agreement obligates UCSB to provide, by August 1, 2019, information sufficient for the Office of Civil Rights to determine that UCSB is promptly resolving Title IX allegations. "That information shall include, at a minimum, the date the allegation was made, the date of any interim suspension, the date recommended findings were made by the Title IX office, the date the Office of Judicial Affairs issued its final decision, and any communications with parties regarding investigations that last longer than the time period set out in University policy. This information will be provided for all Title IX allegations made from the date of this agreement through the end of the 2018-19 school year." (Resolution Agreement, ¶ (B)(2).)

Doe contends, and we agree, that the Regents's arguments at the hearing were misleading. UCSB had stipulated to corrective action three weeks before the hearing on Doe's fee motion and knew what the outcome was of N.N.'s complaint. The Regents knew UCSB had agreed to implement major changes in its Title IX investigations to resolve compliance concerns raised by the Department of Education in response to N.N.'s complaint. The superior court had evidence before it that Doe's case had influenced N.N. to file her complaint, but the outcome of her complaint and the Resolution Agreement was not disclosed to the court. Instead, the superior court was left with the erroneous belief that there had been no favorable or relevant outcome to N.N.'s complaint.[8]

The Regents contend that the outcome of N.N.'s complaint with the Department of Education and, hence, the Resolution Agreement, are irrelevant for the purposes of determining whether Doe's action provided a significant benefit to the public. This contention is unpersuasive. First, in denying Doe's fee motion, the superior court stated there was no evidence before it of any "widespread misapplication of [section] 105.08 at UCSB, such that any large class of persons could potentially have been impacted." The Resolution Agreement, however, shows there was a systemic problem in UCSB's Title IX office concerning the timeliness of Title IX investigations, "particularly in situations in which a [student] has been subject to an interim suspension." (Resolution Agreement, ¶ (I)(A).) Indeed, this is not the first case this court has seen in which a Title IX investigation

_____

[8] During oral argument before this court, the Regents's counsel stated he was unaware of the Resolution Agreement at the time of the superior court's hearing on the fee motion.

at UCSB exceeded the governing time requirements under the school's written policies while a student was subject to an interim suspension. (See, e.g., *Doe v. Regents of the University of California* (2018) 28 Cal.App.5th 44, 47 [Title IX investigation took 10 months to complete after student was placed on interim suspension].)

Second, surely UCSB was aware of the March 21, 2017, injunction against it in this case when it entered into the Resolution Agreement. It strains credibility to believe that UCSB did not take into account the injunction when it entered into the Resolution Agreement. Both this court and the superior court had held the university accountable for the very compliance issues addressed in the Resolution Agreement. The changes in UCSB's Title IX office required by the Resolution Agreement will impact all students at UCSB, in particular, those subject to the disciplinary process, including victims of sexual harassment and violence. This additional evidence, which was in UCSB's possession at the time of the hearing, was relevant and supported Doe's request for attorney's fees. (See, e.g., *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 496 [significant public benefit where litigation prompted agency to improve methods of creating and managing its CEQA records].)

Even if Doe's action had not influenced N.N. to file her complaint with the Department of Education, by the time she had done so, USCB had already received unfavorable decisions from the superior court and this court in Doe's case holding it accountable for its delay in completing the Title IX investigation in violation of its policies. Requiring UCSB to comply with its policies in student misconduct cases provides a significant benefit to all UCSB students.

Finally, the cases relied upon by the Regents are distinguishable.  (See *Ryan v. Cal. Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1045 [trial court abused its discretion by awarding attorney's fees under section 1021.5 because the litigation was "simply a substantial evidence matter involving [plaintiff's] personal interests" only]; *Tuthill v. City of San Buenaventura* (2014) 223 Cal.App.4th 1081 [appellate court reversed award of attorney's fees under section 1021.5 because moving parties were not the successful parties; moving parties did not obtain the relief sought or vindicate an important right]; *Pacific Legal Foundation v. California Coastal Commission* (1982) 33 Cal.3d 158, 167 [primary effect of the lawsuit was to invalidate a permit condition not supported by substantial evidence; attorney's fees properly denied where the action vindicated only the rights of the owners of a single parcel of property and did not represent "a ringing declaration of the rights of all or most landowners in the coastal zone"].)

*Necessity and Financial Burden of Private Enforcement*

The final element required for an award of fees under section 1021.5 is that the "necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ."
(§ 1021.5.)  The superior court concluded it was unnecessary to decide whether this element had been established because Doe failed to show that the litigation satisfied the significant benefit element.  Nevertheless, the court noted it was "questionable whether [he] has met [the necessity and financial burden] requirement."

"[T]he necessity and financial burden requirement "'really examines two issues:  whether private enforcement was

28.

necessary [first prong] and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys [second prong].'" [Citations.] The 'necessity' of private enforcement "'"looks to the adequacy of public enforcement and seeks economic equalization of representation in cases where private enforcement is necessary."' [Citations.]"'" (*Whitley*, *supra*, 50 Cal.4th at pp. 1214-1215.) "[T]he 'necessity . . . of private enforcement' has long been understood to mean simply that public enforcement is not available, or not sufficiently available." (*Id*. at p. 1217.) Here, the "'necessity . . . of private enforcement'" requirement was satisfied because public enforcement of Doe's rights was unavailable. "Strong personal motivation may increase the *likelihood* of private enforcement, but it does not, as a logical matter, affect the *necessity* of private enforcement—only the availability of public enforcement does that." (*Ibid*.)

"The second prong of the inquiry addresses the 'financial burden of private enforcement.' In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield." (*Whitley*, *supra*, 50 Cal.4th at p. 1215.) "'The final step is to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case. . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.'" (*Id*. at p. 1216.) Doe neither expected to receive nor received any monetary award for his

litigation contesting the interim suspension.  It follows that he has satisfied the second prong.  (See *Wilson v. San Luis Obispo County Democratic Central Committee* (2011) 192 Cal.App.4th 918, 927 ["The Committee met the second prong . . . because the litigation yielded no financial benefits to offset the Committee's litigation costs"].)

The superior court stated that Doe's primary purpose in filing this action "was to pursue and protect his own rights and interest by having the interim suspension modified or vacated, and being reinstated as an active student pending the completion of the investigation of the charges made against him."  Doe's nonpecuniary motive does not disqualify him from satisfying the requirements of the second prong.  "[A] litigant's personal nonpecuniary motives may not be used to disqualify that litigant from obtaining fees under Code of Civil Procedure section 1021.5. . . .  [T]he purpose of section 1021.5 is not to compensate with attorney fees only those litigants who have altruistic or lofty motives, but rather all litigants and attorneys who step forward to engage in public interest litigation when there are insufficient financial incentives to justify the litigation in economic terms." (*Whitley, supra*, 50 Cal.4th at p. 1211.)

The parties do not dispute that Doe had no ability to pay for legal representation, as would be true for most students.  Without representation, the interim suspension in this case would have resulted in a de facto expulsion, in violation of UCSB's policies.  In these circumstances, the necessity and financial burden of private enforcement makes an award of attorney's fees under section 1021.5 appropriate.  (See *Slayton v. Pomona Unified School Dist.* (1984) 161 Cal.App.3d 538, 552-553 [attorney fees awarded in case in which a group of students were

wrongfully disciplined, when they had no pecuniary interest at stake].)  The policy underlying section 1021.5 is furthered by awarding fees.

*Amount of the Attorney's Fees*

Finally, the Regents contend that if we conclude Doe meets the requirements to justify an award of attorney's fees under section 1021.5, any award of fees must be significantly reduced.  The appropriate amount of fees is a distinct question from whether a fee award is justified.  The superior court should determine in the first instance the appropriate amount of fees to be awarded and the amount of the multiplier, if any.  (See *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 616, 623.)

*Disposition*

The judgment of dismissal is affirmed.  The postjudgment order denying attorney fees is reversed and the matter is remanded to the superior court for a determination of the amount to be awarded.  Doe is awarded costs on appeal.


YEGAN, Acting P. J.


We concur:



PERREN, J.



TANGEMAN, J.




31.

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Robert P. Ottilie for Plaintiff and Appellant.

Nye, Stirling, Hale & Miller, Jonathan D. Miller and Alison M. Bernal for Defendant and Respondent.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | 2d Civil No. B293153<br>(Super. Ct. No. 16CV04758)<br>(Santa Barbara County)<br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

          The opinion in the above-entitled matter filed on June 5, 2020, was not certified for publication in the Official Reports.  For good cause, it now appears the opinion should be published in the Official Reports and it is so ordered.


_____

YEGAN, ACTING P.J.          PERREN, J.          TANGEMAN, J.